# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39119**

———————————

**UNITED STATES**
*Appellee*

**v.**

**David CONTRERAS, Jr.**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 31 January 2018

———————————

*Military Judge:* J. Wesley Moore.

*Approved sentence:* Dishonorable discharge, confinement for 1 year, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 13 February 2016 by GCM convened at Shaw Air Force Base, South Carolina.

*For Appellant:* Major Allen S. Abrams, USAF; Philip D. Cave, Esquire.

*For Appellee:* Lieutenant Joseph J. Kubler, USAF; Major Mary Ellen Payne, USAF; Captain Michael T. Bunnell, USAF; Gerald R. Bruce, Esquire.

Before HARDING, SPERANZA, and HUYGEN, *Appellate Military Judges.*

Senior Judge HARDING delivered the opinion of the court, in which Judges SPERANZA and HUYGEN joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

———————————

HARDING, Senior Judge:

Appellant pleaded not guilty to six specifications of sexual misconduct arising from his interactions at a weekend wedding celebration with two women, SM and SH. A general court-martial composed of officer and enlisted members found Appellant guilty of only one of the six specifications: sexual assault of SH by committing a sexual act upon her when she was incapable of consenting due to impairment by alcohol in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920. The court-martial sentenced Appellant to a dishonorable discharge, confinement for one year, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

Appellant raises the following four issues on appeal: (1) whether the military judge committed error when he instructed the members they could consider evidence of the other five charged sexual assault offenses as evidence of Appellant's propensity to commit the sexual assault of which he was eventually convicted; (2) whether the evidence is legally and factually sufficient to support the finding of guilty and overcome the defense of mistake of fact as to consent; (3) whether the military judge should have instructed the members on the term "incapable" upon request by defense counsel; and (4) whether the military judge abused his discretion in ruling certain evidence inadmissible under Military Rule of Evidence (Mil. R. Evid.) 412. In addition, although not raised by Appellant, we note the post-trial processing of his case was subjected to a facially unreasonable delay.[1] Following our superior court's holding in *United States v. Hills,* 75 M.J. 350 (C.A.A.F. 2016), we conclude the military judge erred with regard to the instruction on propensity and the error is not harmless beyond a reasonable doubt. We thus set aside the conviction and sentence and do not address the remaining issues.

## I. BACKGROUND

In the middle of August 2014, Appellant travelled to King George, Virginia, to not only attend, but also officiate the wedding of his friends, Staff Sergeant (SSgt) CC and JC. Appellant's interactions with SM on the night of the re-

---

[1] The 120-day sentencing-to-action standard established in *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), was exceeded in this case. Because we are setting aside the conviction and sentence for other reasons, we are not addressing whether the delay amounted to a violation of Appellant's due-process right to timely post-trial review or whether relief for post-trial delay is otherwise appropriate. *See id.* at 143; *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016); *United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002).

hearsal dinner formed the basis of the four specifications related to SM. Appellant's interactions with SH after the wedding reception formed the basis of the two specifications related to SH.

## A. Appellant and SM

On the Thursday evening preceding the Saturday wedding ceremony, SSgt CC's family hosted a rehearsal dinner at their home. Appellant attended the dinner, as did SSgt CC's step-sister, SM. SM, Appellant, and others drank alcohol before the dinner. Many attendees, including Appellant and SM, remained at the family home after dinner and continued to consume alcohol. SM testified that over the course of the evening she consumed liquor, wine, and beer and estimated that she consumed "probably six to ten mixed drinks and maybe five to eight shots." At some point, SM went outside to smoke and sat on the tailgate of her father's truck. Appellant joined her there.

While seated together, Appellant and SM engaged in a consensual kiss until Appellant began to pull her on top of him as he lay down in the bed of the truck. SM testified that she immediately jumped off the truck tailgate and told him they were "not going to do that at [her] parent's house." Appellant kissed SM again, partially lifted up her skirt, and touched her thigh. SM pushed his hand away from her thigh and told him to stop. Appellant "did it again" and SM once again pushed his hand away and told him to stop. Appellant then attempted to put his hand up her shirt. SM responded by pushing Appellant on his chest, causing him to back up a foot or more. SM then told Appellant she was going back inside and did so. Once back in the house, SM continued to drink, dance, and socialize. SM described herself as "pretty intoxicated" at that point and stated her memory of the remainder of the night consisted only of "flashes."

Later that evening, SM was sitting outside on the deck of the house when Appellant joined her. SM and Appellant were seen by others as they departed the house or entered the house to go to bed. Appellant and SM eventually went back inside the house and descended a spiral staircase to the basement where two beds and a mattress on the floor had been prepared for guests. MC, a friend of the bride, and NM, SM's brother, were already in the basement.

Once downstairs, SM went to the basement bathroom and vomited. Appellant followed SM into the bathroom. SM testified she did not remember everything that happened while in the bathroom but she did recall hearing Appellant say "[t]hat's what I like to see," or words to that effect, while she was on her hands and knees, vomiting. Other witnesses corroborated SM's account of her vomiting in the basement bathroom.

SM further recalled "laying [sic] on the floor with [Appellant] on top of [her] having intercourse with [her] vaginally." SM testified that she sat up, told Appellant to "wait," to "stop," and asked Appellant what "they" were doing. Appellant answered, "it's okay." SM told Appellant "no" and that her brother, NM, was right on the other side of the door. Appellant replied, "no, no it's okay, we're being quiet" and continued. Subsequent to that, SM likened herself to a "dead fish," without the ability to exercise control over her body. SM then described how Appellant straddled her face by placing his legs on each side of her shoulders while holding her head up with one hand. Appellant then placed his penis in her mouth with his other hand as she "was just laying [sic] there." SM testified her next flashes of memory were of Appellant penetrating her vagina with his penis once more, asking Appellant "if he finished," and asking him whether she "needed to get a morning after pill." SM left the bathroom, got into one of the beds, and went to sleep. SM woke up the next morning in bed with Appellant. SM testified that Appellant tried to place his hand down the front of her pants and attempted to rub her on the outside of her pants, but that she pulled his hand away on each attempt.

The members acquitted Appellant of the four Article 120, UCMJ, specifications relating to SM. Specifically, Appellant was acquitted of: (1) abusive sexual contact by rubbing SM's thigh with his hand without her consent; (2) abusive sexual contact by rubbing her genitalia with his hand without her consent;[2] (3) sexual assault by penetrating SM's vulva with his penis; and (4) sexual assault by penetrating SM's mouth with his penis. Both sexual assaults against SM were alleged to have occurred when SM was incapable of consenting due to impairment by alcohol.

---

[2] Appellant moved for a finding of not guilty for this specification, Specification 4 of the Charge. The military judge granted the motion as to the greater offense of abusive sexual contact, but denied it as to the lesser-included offense of attempt. Instead of informing the members of his finding and instructing on the lesser-included offense, the military judge directed a new flyer without the original Specification 4 and with a "Charge II" and Specification of attempted abusive sexual contact in violation of Article 80, UCMJ, 10 U.S.C. § 880. In effect, the military judge created a legal fiction as Charge II was never preferred and referred. The military judge then instructed on "Charge II" and its Specification, and the members found Appellant not guilty. The net effect of the military judge's actions and the members' finding of not guilty is that Appellant is found not guilty of Specification 4 of the Charge (and any lesser-included offense). While the legal fiction did not prejudice Appellant, the court-martial order omits the not-guilty finding for Specification 4 of the Charge and therefore is inaccurate.

**B. Appellant and SH**

SH arrived without her husband the Friday evening following the rehearsal dinner, and she spent that night at her parents' house while her husband remained at their home in another city. SH approached Appellant at the wedding reception the following day, introduced herself, and complimented him on his performance as the officiant of the ceremony. During their initial conversation, Appellant specifically asked SH where her husband was. The conversation ended shortly thereafter. SH testified that she drank one glass of wine and "about" five mixed drinks over the course of approximately two and a half hours. On cross-examination, SH conceded that it may have been only four four-ounce mixed drinks, that the drinks were about half the size of what she normally consumes at a bar, and that the drinks were "not very strong drinks." When asked how her alcohol consumption at the wedding reception affected her, SH stated she was "feeling fine" and was "just relaxed." Other witnesses testified they observed no signs that SH was intoxicated. At the conclusion of the reception at approximately 2300 hours, SH left with a few others, including Appellant, and went to SSgt CC's parents' home.

Once at the home, SSgt CC's sister, MC, provided SH a beer she drank slowly while she talked to MC. A little later, SH and MC began dancing. Appellant asked SH to dance with him and she agreed. SH testified that Appellant reached for her hip and placed his hand on her buttocks. SH stepped back and told Appellant "[she] did not want him to do that, that [she] was married, and that he just couldn't do that." SH testified that Appellant touched her buttocks a second time and that, in an attempt to get away from Appellant, she obtained a second beer and went outside to the deck. SH described herself as feeling lethargic and groggy at that point.

Appellant joined SH on the deck and engaged her in conversation. SH, noting that Appellant was not "trying anything," testified that she felt comfortable with Appellant being there. Three witnesses who saw Appellant and SH talking testified that SH appeared to be having fun and looked comfortable with Appellant. No witness observed SH slurring her speech, looking confused, or appearing non-responsive as she sat on the deck with Appellant.

SH testified that although she did not vividly recall the conversation with Appellant, the topic of SH's husband came up again. SH then testified as follows:

> I'm sorry, I couldn't tell you for sure, but at one point he did lean over to try and kiss me. I leaned back, and I told him stop, not to do it. And then he grabbed my hand and placed it over his crotch. I yanked my hand away. And then I don't really remem-

5

> ber much after that. I remember a rocking sensation and I re-
> member not knowing what that meant, because like in a dream,
> you know, feeling, it's like it -- it's not how it feels in normal life,
> you know. I don't really know how to describe it. So everything
> was just -- felt like so far away, and so far removed, and just sort
> of bewildering. My next memory is that I -- it's like I snapped
> awake, it's like I come to, and when I do that, I'm in the woods,
> and it's dark, and I'm running, and I remember touching the
> trees as I'm running through them to sort of like help guide me,
> because it was really dark out.

SH then described arriving back at the house, going inside, and finding a couch to sleep on. When she woke up the next morning (Sunday), there were twigs and leaves in her hair, and her feet were covered in sand. She described asking Appellant what had happened.

> He sort of smiled and was looking really smug, and he was like,
> "Well, we hooked up." I said, what do you mean we hooked up?
> What did we do? He said, "We did everything." And I asked him,
> what is everything? What does that mean? Did we have sex? And
> he said, "Yeah," and he said that it was my idea, and that it took
> place in the kitchen. And then he told me -- and then I said I was
> furious, and just so overwhelmed, and was like, well, I do not
> remember anything that happened, and I remember him telling
> me not to be mad. And I remember him taking little baby, [L[3]],
> and sort of holding him up and like saying it again in a little
> baby voice, as if L was saying it, not to be mad. And then he told
> me that he wouldn't tell anybody.

SH returned to her parents' house and planned to drive back home that same day. Her parents noticed that she did not look well and advised her not to drive in her condition. SH told her mother what she remembered from the night before, what Appellant had told her, and that she did not consent to sex with Appellant. Her mother told her that she had been raped. SH then drove home and told her husband what had happened. The next day (Monday), she went to a hospital for a sexual assault examination. The examination documented some bruising, but SH stated the bruises were consistent with bruising as a result of her work in a bakery, except for the bruising on her upper thighs and arms. SH did not report any soreness or injury. A swab taken from SH's cervix contained DNA material that matched the DNA profile of Appellant.

---

[3] L is the infant son of SSgt CC and JC.

Appellant was convicted of sexually assaulting SH by committing a sexual act upon her when she was incapable of consenting due to impairment by alcohol. Appellant was acquitted of abusive sexual contact of SH by grabbing her buttocks without her consent.

## C. Findings Instructions

The military judge provided the members the standard spillover instruction that "each offense must stand on its own" and that they were required to "keep the evidence of each offense separate." The military judge then instructed the members on "exceptions" to this general rule permitted by Mil. R. Evid. 404(b) and Mil. R. Evid. 413 as to both charged and uncharged sexual offenses.

In accordance with Mil. R. Evid 404(b), the members were instructed they could consider evidence that Appellant committed the charged sexual abusive contact of SH for the limited purpose of its tendency, if any, to prove a plan or design by Appellant; to prove that Appellant intended to gratify his sexual desires; and to rebut a contention of Appellant that his participation was the result of mistake. This instruction only applied to whether Appellant committed the charged sexual assault of SH. A similar Mil. R. Evid. 404(b) instruction was provided for the two uncharged sexual offenses consisting of evidence that Appellant may have placed SH's hand on his crotch and that he may have grabbed the buttocks of SM.

The military judge also provided two instructions pursuant to Mil. R. Evid. 413—one for evidence of the charged sexual offenses and one for evidence of the uncharged sexual offenses. The erroneous instruction at issue concerns the use of evidence of the charged offenses. The military judge gave the instruction as follows:

> Additionally, each of the charged sexual offenses may be considered for an additional purpose. This rule applies to all of the specifications of Charge I and Charge II.[4] This evidence may have no bearing, however, on your deliberations unless you first determine by a preponderance of the evidence that it is more likely than not these offenses occurred, even if you are not convinced beyond a reasonable doubt as to these offenses. If you determine by a preponderance of the evidence those other offenses occurred, you may consider the evidence of those offenses for its

---

[4] As explained above, a legal fiction of a Charge II was created to put the lesser-included offense of attempted abusive sexual contact—Specification 4 of the Charge—before the members.

> bearing on any matter to which it is relevant only in relation to the remaining charged sexual offenses.
>
> You may consider the evidence of such other sexual offenses for their tendency, if any, to show the accused's propensity to engage in the remaining sexual offenses. You may not, however, convict the accused merely because you believe that he committed these other offenses, or merely because you believe he has a propensity to engage in offenses of sexual assault. The prosecution's burden of proof to establish the accused's guilt beyond a reasonable doubt remains as to each and every element of each offense charged.

A similar propensity instruction was provided for the two uncharged sexual offenses (that Appellant may have placed SH's hand on his crotch and that he may have grabbed the buttocks of SM).

## II. DISCUSSION

### A. Mil. R. Evid. 413

The meaning and scope of Mil. R. Evid. 413 is a question of law that is reviewed de novo. *Hills*, 75 M.J. at 354 (citing *LRM v. Kastenberg*, 72 M.J. 364, 369 (C.A.A.F. 2013). Instructional errors are also reviewed de novo. *Id.* at 357 (citing *United States v. Killion*, 75 M.J. 209, 214 (C.A.A.F. 2016)).

Mil. R. Evid. 413(a) provides that, in a court-martial where the accused is charged with a sexual offense, evidence that the accused committed other sexual offenses may be admitted and considered on "any matter to which it is relevant." This includes the admission of evidence of sexual assaults to prove the accused has a propensity to commit sexual assault. *United States v. James*, 63 M.J. 217, 220 (C.A.A.F. 2006).

However, in *Hills*, the United States Court of Appeals for the Armed Forces (CAAF) held that evidence of the accused's commission of a sexual assault may *not* be used to prove propensity if the alleged sexual assault is charged in the same court-martial and the accused has pleaded not guilty to it. *Hills*, 75 M.J. at 356. The CAAF further held that the instructions accompanying the admission of evidence of charged offenses for Mil. R. Evid. 413 purposes "violated Appellant's presumption of innocence and right to have all findings made clearly beyond a reasonable doubt, resulting in constitutional error." *Id.* Because "there are constitutional dimensions at play," prejudice for such an error must be tested for harmlessness beyond a reasonable doubt. *Id.* at 357 (citations omitted). "An error is not harmless beyond a reasonable doubt when 'there is a reasonable possibility that the [error] complained of might have contributed to the conviction.'" *Id.* (Citations omitted). "To say that an error did

not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *United States v. Othuru,* 65 M.J. 375, 377 (C.A.A.F. 2007) (internal quotation marks omitted) (citation omitted).

In *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017), the CAAF clarified that under *Hills* the use of evidence of charged conduct as Mil. R. Evid. 413 propensity evidence for other charged conduct in the same case is error, regardless of the forum, the number of victims, or whether the events are connected. *Id.* at 222. The CAAF reiterated, "Whether considered by members or a military judge, evidence of a charged and contested offense, of which an accused is presumed innocent, cannot be used as propensity evidence in support of a companion charged offense." *Id.* Where such error exists, the Government must prove there was no reasonable possibility that the error contributed to the verdict. *Id.*

## B. Analysis

The Government contends the error in Appellant's case is harmless beyond a reasonable doubt for two reasons. First, the Government argues "propensity" is a red herring because this case turns on capacity, not proclivity. Second, the Government argues that, even if propensity could factor into the analysis, the acquittal for five of the six specifications demonstrates the members' "disinterest" and "indifference" to the propensity evidence and rebuts the notion that the members "used propensity evidence to fill the gaps of reasonable doubt." We disagree.

In order for Appellant to be convicted of sexual assault of SH, the Government had to prove beyond a reasonable doubt that Appellant (1) committed a sexual act upon SH, and that (2) he did so when SH was incapable of consenting to the sexual act due to impairment by alcohol and that condition was known or reasonably should have been known by Appellant. *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 573–74 (10 Sep. 2014). The evidence that Appellant committed a sexual act upon SH is direct and overwhelming. Appellant told SH that they had engaged in sexual intercourse, and a DNA sample matching Appellant was collected from SH's cervix. In contrast, the evidence that SH was incapable of consenting due to impairment by alcohol is exclusively circumstantial. The Government argued that SH's reported lethargy on the deck, her resistance to Appellant's initial overtures, her memory loss, and her physical condition the next morning all supported the inferences that SH was incapable of consenting at the time of the sexual act *and* that Appellant either knew or should have known that. While this evidence is legally sufficient, it is hardly overwhelming. Having assessed the strength of the evidence, we now consider whether there was a reasonable possibility that the propensity instruction contributed to the verdict.

The trial counsel paraphrased the propensity instruction twice, argued its direct application to two specifications, and more generally argued the parallelism of Appellant's actions involving SM and SH, that is, his propensity to commit all the charged offenses. Additionally, trial counsel used the following metaphor to describe Appellant as a person who engages in sexual conduct in spite of demonstrated lack of consent or incapability to consent:

> [Appellant] runs red lights. As he's driving along towards an intersection, when he sees the light turn yellow, he doesn't slow down, he doesn't hit the brakes, he just keeps driving along. And as that light turns red, he blows straight through it. And in August of 2014, at the wedding of [SSgt CC and JC], [Appellant] blew through red light, after red light, after red light, after red light.

> Because that's what he does. He drives toward the intersection trying to get what he wants, and completely disregards it, and the judge gave you the instruction about that as well.

Appellant's propensity continued as a major theme throughout the closing argument by trial counsel.

The Government now argues the acquittal for five of six specifications demonstrates that the members disregarded improper propensity evidence and that such evidence did not contribute to the conviction. We do not share the Government's confidence. As the CAAF stated in *United States v. Guardado*:

> It simply does not follow that because an individual was acquitted of a specification that evidence of that specification was not used as improper propensity evidence and therefore had no effect on the verdict. It is conceivable that the panel found that Appellant committed the other three charged offenses by a preponderance of the evidence but not beyond a reasonable doubt. While not persuaded of Appellant's guilt to the point of convicting him, members could still have believed that it was more likely than not that Appellant sexually assaulted SW and CH and used that evidence for propensity purposes, thus violating Appellant's presumption of innocence.

77 M.J. 90, 2017 CAAF LEXIS 1142, at *9 (C.A.A.F. 2017). While not persuaded of Appellant's guilt beyond a reasonable doubt for five of the specifications, the members could still have believed that it was more likely than not that Appellant sexually abused and assaulted SM and sexually abused SH and then used that evidence for propensity purposes to convict for one specification.

The Government further argues that evidence of Appellant's propensity had no bearing on whether SH was in fact incapable of consenting due to impairment by alcohol or whether Appellant knew or should have known of her condition and, therefore, could not have contributed to the verdict. While it might be true that evidence of Appellant's propensity to commit sexual assault, in and of itself, does not directly or even circumstantially tend to prove the victim's incapability to consent or Appellant's knowledge of such a condition, the Government's argument overlooks how the propensity evidence may have been used to bolster other evidence that does prove such incapability or knowledge. Indeed, this is precisely what trial counsel did. He used the propensity evidence of Appellant's actions involving both SM and SH in a metaphor to bolster other evidence that Appellant engaged in a sexual act with SH when she was incapable of consenting because "that's what he does." The trial counsel essentially used the erroneous propensity instruction to "thicken other proofs that do demonstrate thinly."[5] In such a case, we cannot be confident there is "no reasonable possibility" that the erroneous instruction contributed to the verdict. *Hukill*, 76 M.J. at 222. Thus, we cannot affirm Appellant's conviction.

### III. CONCLUSION

The finding of guilt and the sentence are **SET ASIDE**. A rehearing is authorized. Article 66, UCMJ, 10 U.S.C. § 866.[6]

FOR THE COURT

KATHLEEN M. POTTER
Acting Clerk of the Court

---

[5] WILLIAM SHAKESPEARE, THE TRAGEDY OF OTHELLO, THE MOOR OF VENICE act 3, sc. 3.

[6] The court-martial order (CMO) erroneously reflects a finding of not guilty for the charge in violation of Article 120, UCMJ. As discussed above, the CMO also erroneously characterizes the military judge's decision on a Rule for Courts-Martial (R.C.M.) 917 motion as a dismissal of Specification 4 of the Charge instead of a finding of not guilty of the greater offense. Further, instead of reflecting that Appellant was found not guilty of Specification 4 of the Charge, the CMO perpetuates the legal fiction of Charge II. We order promulgation of a corrected CMO to accurately reflect the findings for the arraigned charges. The finding for Specification 4 of the Charge should read "NG" to reflect that the military judge and members found Appellant not guilty of the greater and lesser offenses, respectively. All references to Charge II, its plea, and its finding are ordered deleted.